Good morning, may it please the court. My name is Robert Storey. I'm here on behalf of Mr. French. Mr. French has raised three items on appeal. He disputes that there was sufficient evidence to convict him of defrauding anyone. He disagrees with the jury instruction, and he thinks that the sentencing guidelines were exceeded in his particular case. I think the clearest issue here is his intent to defraud. Mr. French is guilty of a number of things, but defrauding people wasn't one of them. He's guilty of bad judgment. He's guilty of being a difficult person. He's guilty of being a very disorganized business person, but he's not guilty of defrauding anyone. This case should have ended up in bankruptcy, not in a criminal prosecution. The things that Mr. French did do to try to provide his potential customers with high-end appliances are he went to great lengths. He went to different distributors. He did everything he could do to obtain these appliances and provide them to his clients. In fact, at the suggestion of one of the distributors of these high-end appliances, he actually purchased a company called Abco, who purportedly, Abco purportedly had licenses to sell these appliances and, in addition, had $500,000 in floor financing, which would have accommodated the sale of these appliances. Once he purchased Abco at the recommendation of one of the distributors, the distributor turned to him and said, we're not going to distribute anything to you until you pay off a $35,000 debt that Abco owes us. He paid off the $35,000 debt. The distributor turned to him and said, we're not going to sell the appliances. So he was completely left out in the dark, and he couldn't provide the appliances that he had been trying to sell over the Internet. Counsel, let me just ask you the following question, though. Clearly, there is a potential innocent explanation for what happened, but our standard of review on sufficiency of the evidence requires us to view it in the light most favorable to the jury's verdict, which in this case was a verdict of guilty. So I guess my question is, why, in your view, the jury had to believe these innocent explanations rather than the fact that they very well knew that they weren't able to fill these orders, collected $1.6 million from their customers and used it to buy boats and other personal things without making any effort to actually fill the orders? Why couldn't the jury have believed that they intended to simply pocket this money? I think the jury did believe that, and that's why they concluded that. And why weren't they entitled to under the evidence here? Well, this is an example of Mr. French's extraordinarily poor judgment. He tried this case himself. This is a very complicated case. That's not the question really before us. The question is, given the evidence that the government produced, his self-representation was constitutionally permissible and is not challenged here. So for whatever reason, he tried the case himself. But isn't there enough here to allow an aggression jury to infer that this was fraudulent all along and not innocent? I don't think so, given the number of things that he did. In fact, you know. But just before you answer the question. In fact, it doesn't have to be fraudulent all along. It has to be fraudulent at some point, right? That's true. So even if he began thinking that this was going to work, but it became obvious at some point that it wasn't going to work, and then he continued to conjole people into buying the products and also into not giving people refunds and also putting the money in his own pocket. And I understand he has explanations for that, but those certainly didn't have to be believed. So even if one assumes that he began thinking I'm going to buy these appliances and sell them at a loss and build up a business and didn't realize that the high-end appliance distributors and manufacturers are extremely, and I know this from personal knowledge, rigid about the prices at which their products are sold, but once he found that out, why couldn't the fraud have started at that point? I'm sorry? So answer Judge Graber's question. But with that in mind, i.e., it doesn't have to have been all along. I didn't catch the last several words you said. Just answer Judge Graber's questions about the overall sufficiency, but with the understanding that it doesn't have to have been fraudulent all along. The district court actually concluded that. I think at sentencing the district court said this didn't start out as a fraudulent scheme. The judge actually concluded that. But I'm saying it didn't end in a fraudulent scheme either. To the very end, he was processing refunds. His wife had intimate knowledge about how Discover and American Express worked, and she actually processed refunds for these folks. So, too, from day one until day last, he did everything he could do to try. I thought, you know, when I read that carefully, it seemed to me that what she was really processing were claims that American Express and Visa should do the refunds, not that they should do the refunds. That's right. Because they didn't have money. That's correct. I misstated. Right. That's exactly what happened. Well, that doesn't prove that they were trying to cover their problems. Well, I think it does. And in addition to that, they tried to cut a deal with American Express and Discover to try to repay the money, but because the business had imploded, there was simply no way for them to pay the money. But these folks went to extraordinary lengths to try to accommodate these people, and I don't see any evidence that they intended to defraud people. Well, they apparently told people, you know, the original state, I should say the original statement, I think the government is over-reading as saying that we are authorized dealers. It doesn't seem they were really saying that. But they did later say specifically to some people, you know, that they were in contact with Viking, which they were not, and certainly suggests that they were directly that they were authorized and ordinary distributors. I think that is true, but that's true of many businesses out there. And that's the sort of runaround you get from a car dealer for the most part. But that doesn't make it dishonest. Well, it's not honest. Well, I guess that's a poor business practice, and you're correct. It is dishonest. It's a lie designed to induce people to continue to deal with them. That's true, but their intent was not to defraud them. Their intent was to provide them with these high-end appliances. And you're correct about your observation about the difficulty in dealing with these high-end appliance dealers. Mr. French apparently had it in his mind that he was able to undercut through the Internet the cost of these high-end appliances, didn't do his research, didn't realize, I don't think at first, that these high-end appliances had this minimum, what do they call it, universal minimum price. They set a price, and you can't undercut that price. That's why he was ultimately never able to deliver the appliances, not because he intended to defraud someone, but because he couldn't follow through. Once he bought Abco in order to deliver the appliances with the floor financing that would have allowed him to finance the acquisition of all these appliances, the distributor pulled the rug out from under him. They conned him. They said, pay back this $35,000 that Abco owes us, and we'll let you distribute. As soon as he paid the money back, they turned around and they said no. So for those reasons, I don't think there is sufficient evidence for the jury to have concluded that he defrauded anyone or intended to defraud anyone. The result was a disaster. There was $1.5 million worth of loss in this whole thing, which should have ended up in a bankruptcy, not in a criminal prosecution. In addition, the money that he allegedly took out for his own personal benefit, the evidence is that he simply put it back in. He bought two vehicles, both for delivery. He bought a boat, which he used to ingratiate himself, with makers of high-end homes up in the Lake Tahoe area. In addition, he put four different amounts of money into an E-Trade account. All of that money went back into the Abco business to try to keep this thing running. But none of it went to try to purchase, as far as I could tell, none of it went to purchase appliances to fulfill the customer's orders that were out there waiting, that they had kept reassuring people that, oh, it's just waiting to ship. We've got it, and it's coming, which was also not true. I don't think that's an entirely correct way to view the evidence. He ultimately didn't buy the appliances because no one would sell him the appliances. Well, for whatever reason, he didn't. He was still telling people that items were waiting to be shipped to them when he knew that he couldn't ship to them, and he still had their money. I think he knew that he didn't have the appliances in hand. I don't think that he knew that he couldn't ultimately pull this off. I think he was way, way overoptimistic in thinking that he could pull this off eventually. If his intent was to abscond with his money, the smart thing to have done was simply collect the money and take off with the money. He didn't do any of that. But many Ponzi schemes, this is not a Ponzi scheme exactly, but, I mean, they do depend on paying some people off. So this depends on providing appliances to some people. And once he gets around that nobody's getting appliances, there's no business. I think that's correct. But it wasn't his fault exactly that he couldn't provide the appliances. He went to great lengths to try to get these appliances. He wasn't trying to defraud the people. He was trying to start an Internet business. And that may have been true at the outset. Yes. The question is, what about once he realized that there were these limitations on resale and, I mean, he could at that point. I mean, the only way he could have operated at that point was to buy the appliances at full cost and sell them at full cost, which isn't much of a business. That's correct. He should have thought about that. But he could have done that and fulfilled the orders. That was one of his ideas was I'm just going to go buy these at full cost and fulfill the orders. It didn't pencil out. He would have completely run out of money. He started out by buying them at full cost and selling them at 20 percent less. But that was an experiment to determine whether they – this whole thing started. They had this Internet business where they sold stuff on eBay through consignment. That was relatively successful. There's a lot of remodel in the area, and people would buy appliances, ultimately not use those appliances. So they came to the French's and said, can you sell this for us on eBay? That's where he got the idea that was an extremely successful venture. What he didn't do is didn't do his homework ahead of time and figure out that he couldn't ultimately pull this off. What was it he was trying to pull off? That's not clear to me. He was trying to start an Internet business. But paying full price and advertising that he would sell it for 20 percent less, what's being pulled off there? What's being pulled off, that was simply an experiment to determine, can I pull this off? Can I make this business work? And I apologize for the poor choice of words. I don't think he was trying to pull the wool over anybody's eyes. He simply went out and was willing to take a loss on the first few appliances to determine whether this business model that he had come up with would actually work. What was the business model that the jury heard that he was trying to accomplish? The business model was, I can sell high-end appliances over the Internet for less than you can buy them in a showroom or from a dealer. And the answer- By selling them at a loss. I mean, what other plan did he have at the outset? He bought Abco in order to become a dealer. He was willing to cut his ultimate profit margin in order to undercut everybody else using the Internet. He had a lot of experience selling things on the Internet, was aware that it was a legitimate business model that would allow him to make a business out of it. The problem was that all of the high-end dealers said, no, we're not going to allow our appliances to be sold this way. He was ultimately locked out of the market and couldn't deliver. Not that he was trying to defraud anyone. He simply couldn't pull this off. Counsel, do you want to save your last minute for rebuttal? No, Your Honor, thank you, unless you have any questions. There was one other issue I wanted to point out. I think the jury instructions were incorrect. This was redundant prosecution at best. There were 124 counts in here. This the jury instructions should have talked about the profits from the enterprise, but the jury instructions continue to use the term proceeds. And under the United States Supreme Court case Santos in subsequent years. The precise subject of that, that was the money laundering. Yes. And it had to do with putting the money in the eBay account, in the E-Trade account. Yes. And how was that integral in any way to the ---- You have to do something with the money, Judge. Right. I mean, you can't have thousands and thousands of dollars sitting on your kitchen table. You have to put it somewhere. Put it in a bank. But he didn't disguise it. He simply put it in a bank in his name. That's all he did with it. It wasn't a bank. I thought it was an E-Trade account where he was buying stocks. Buying his own account. That is true. Yes. That is true. But how is that integral to his business? Because you have to do something with the money. You can't have the money. That just washes out any money laundering convictions for anybody, then, with regard to ---- I mean, everybody has to put their money somewhere. That's what the definition of money laundering is, putting your money somewhere when it's ill-gotten money. But you have to disguise it also. And he did nothing to disguise it. It was in his own name. And he even took the money back out and put it back into the business. That's what his intent. His intent was never to launder money. In any case, I see my time is up, and thank you. Thank you, Mr. Story. We'll hear from the government. Good morning. May it please the Court. Good morning, Counsel Elizabeth Olsen-White for the United States. First of all, just a point on this intent to defraud. And as Judge Berzon said, you know, it doesn't have to be a fraud from day one. And the fact of the matter is, the jury, if you look at the jury's verdicts, the jury really gave the French the benefit of some doubt on that. I mean, if you look at there were 62 counts that were all in chronological order by the date that the credit card transaction took place or that the check was in the mail fraud and the wire fraud. And the jury actually acquitted both this defendant, Darren French, and his wife, Jennifer, of the earliest counts. And then it was right around June 15th that the counts that were charged after that date were the counts that Darren French was convicted of. Of 2004, right? Of 2004, right. And so I think that, you know, the French's argument was we were trying to start a business, and we were going to start selling Viking appliances. And maybe they really didn't know that you can't just decide that you're going to be a Viking appliance dealer. And so they put on their eBay page, we carry Viking Sub-Zero Gig. Kagan. Kagan. I don't understand how that makes them suggest that they're claiming to be authorized dealers unless you know independently that you have to be an authorized dealer. So I don't – that seems like an overreach to me. Okay. So just two comments on that, and I take your point. But the two comments that I would make on that is what they say is, we carry the following appliance brands and can order any model configuration from these companies. Now, that was a lie. They did not order any of these appliances from these companies. Well, they did indirectly. They ordered it from somebody who ordered it from the company. I mean, that doesn't sound – I mean, that seems to me to be a weakest point. But they did later start saying things like suggested that they were directly dealing with Vikings. Yes. And they also said once your payment is received, your order will be placed with the manufacturer. And obviously, they didn't place any orders. I have a different – aside from that disquiet from the way you presented your case, the other piece that seems to me bears comment is this purchase, $500,000 purchase, which I gather was just money down the tubes. And if they didn't believe what they said they believed in terms of its viability, why would they do it? Well, I'll tell you what. They, at some point – so they collected $2.8 million from their victims who were sending them money. Or they spent $500,000? They had most of it by then. They bought – I think that they bought ABCO in July, and they had started doing this in April was when they started collecting the money. So most of the money they had collected. And here's the thing about the intent to defraud. I mean, if they had said – they said to these victims, send us your money, we'll send you appliances. Now, if they had said, send us your money, we don't actually have the capability of supplying you with appliances right now, but if you send us money, we will buy an appliance store. And then once we have an appliance store, then we'll be able to. They thought they did have the means as long as they were willing to take the losses. Well, but they had no other money. The only money that they had – and as you said earlier, this wasn't charged as a Ponzi scheme, and it wasn't alleged as a Ponzi scheme, but the fact is they had no other money. So when they're buying appliances at full price and selling them at a 20 percent discount, they are using the money from the later victims to be able to satisfy these early customers. And the point is, is that even if they believed in their hearts that at the end of the day this was all going to work out and they were going to be able to provide people with appliances, that doesn't excuse the outright lies and misrepresentations to get people to give them their money. Because if they had said to the customers, give us your money, we will buy an appliance store, and then we'll be able to give you your Viking stove, a victim or a customer would be able to say, no, I'm going to take my money and I'm going to go to somebody. I'm going to go to an authorized Viking dealer and buy my stove that way. So what you're doing with these misrepresentations, which went on and on for months, these lulling techniques, the truck broke down. Viking says it's going to be with you more weeks. Kagan. I mean, it did strike me that it was an – I was a little surprised that this was a fraud case, because it sounds like a great deal of stupidity and people were hurt. But when they bought this company for $500,000, if it had succeeded, one assumes there wouldn't have been a fraud case. I don't know. Everything else would have been the same. Yeah. This – the business that they bought, using the money that they had obtained from people who wanted to buy appliances, you know, they bought this business, I think it was in July. I don't know that this business was actually an authorized dealer for all of these companies that they listed. But they wouldn't have spent the $500,000 unless they thought it was going to be useful to them in some fashion. Yes. And they never got that $500,000 back, and it was $500,000 out of their pocket. So one has to assume that that was a good faith, if idiotic, thing to do. Yes. Well, but I think that it goes back to, I mean, as Mr. Story was saying, that if they had wanted to just abscond with the money, they could have just absconded. And the fact is, is that if you defraud somebody out of $14,000 because they send you $14,000 for a Viking stove, it doesn't matter whether you use that $14,000 and abscond or put it in an E-Trade account or buy an appliance store. If you're not – you know, if you tell them that I sell appliances, I can provide you with this Viking stove, and they send you their money for this Viking stove, and you – and you actually don't have the capacity to do that, and you're not honest with them, that is the fraud. I mean, that is the fraud. And you spend $500,000 to try to become able to do it. Of their – of the victim's money, of the customer's money. And this is what I'm saying. If – you know, these are people. These are hundreds of – 262 people who are all remodeling their kitchens, and they've all decided to go with the highest-end, you know, Gagno, Sub-Zero, Fisher, Bosch, Viking. And they look around, and they say, oh, this place says that they can give me the stove that I'm looking for for 20% less than I can get it anywhere else. And that once I send them my money, the order will be placed with the manufacturer, and it will be delivered in two to four weeks. So here, I'm going to send you my money. And if they had known – I mean, if the French has had been honest and said, well, we don't actually place orders with the manufacturer, but we're going to take all of this money, and we're going to buy an appliance store, and then we'll be able to give you your appliances, the victim would be able to say, no, I don't think so. I think I'm going to go down to Universal, where I know that they actually have the appliances, have the manufacturer's warranty, have the service contracts, whatever. This was – you know, this was an ongoing fraud that went on for months, and they got more and more desperate about coming up with additional lies. I mean, when you say that the truck has broken down – I mean, the day that one appliance was supposed to be delivered, the customer called and said, why hasn't it arrived? And they said, well, the truck broke down somewhere between Truckee and, you know, South Lake Tahoe. And so the guy stays home all day because, you know – and he never got his appliance, and he never got a refund. And they start telling everybody that they're going to do these refunds. And in fact, what they did at the very end, they processed what are called merchant chargebacks to the Discover and the American Express customers, so that American Express would give the customer back the money, and then they're supposed to be able to collect from the French's, from the merchant, right, who does this chargeback. But it was $1 million for Viking – I mean, for American Express. American Express. $400,000 for Discover. They all got charged back at the very end of August, beginning of September 2004. And then when American Express and Discover went to the French's bank to try to get back the money that they had given back to all the customers, the account was frozen, the account was closed, the account had insufficient funds. So this idea that they should be somehow get credit or praise for having refunded this money – I mean, all that did was change the victim from the 262 individual victims to American Express and Discover. Although – and in addition, the 40 – I think there were 46 victims that were included in this that paid by check. You know, so we had evidence of the folks who paid by check. And those folks are just out their money. I mean, those folks are just out their money altogether. Just briefly on the Santos question, I think – and this is something that was raised repeatedly by the French's. Both represented themselves at trial, and they made several motions, motions to dismiss, and challenges to the jury instructions on Santos. What this Court said in Van Alstyne is that Santos should be read as saying that proceeds means profits. Whenever defining proceeds to mean gross receipts would create the merger problem that the plurality and the concurrence in Santos were concerned with. And so in those cases – and that's a case where, you know, there's a couple different ways to look at it. You can look at that monetary – the particular monetary transaction and say, could this monetary transaction have been charged as the underlying offense? I mean, that's what happened in Santos, right? I mean, the paying the winner, which is the essence of running an illegal lottery, if you're going to say that that's also money laundering, you're making – you know, it could be charged as either one, and therefore you have to prove that it was profits. In this case, what you've got is the defendants are running an Internet fraud scheme, which may or may not have started out as an attempt to have an Internet business, but became an Internet fraud scheme. And they're taking money from their customers, and they're buying a boat, and they're buying a truck, and they're buying – they're putting money in an E-Trade account, which is then used to buy Yahoo stock, and then that Yahoo stock is sold and the money is put into their joint personal account. But as to the boat and the vehicles, their claim is that this was part of the scheme. So I assume that they might have been entitled to an instruction that said something like if you think it was part of the scheme, then you can't separately find it to be money laundering. No, except first of all, just two things. First of all, they weren't saying that it was part of the scheme. They're saying there was no scheme. They're saying it was part of the legitimate. But I think it makes a difference, because the idea is, you know, you have to look at what the scheme was that was alleged in the indictment. I mean, we alleged this Internet scheme. If we had alleged – I mean, if we had said that it was part of the scheme to defraud, that the defendants bought a boat and schmoozed high-end developers in Tahoe to try to convince them that they could supply these appliances, right? I mean, if the scheme that was alleged was a person-to-person, you know, we set ourselves up to look like fancy appliance dealers, right? Then we might have – you know, then we might have this merger problem, because then maybe the purchase of the boat was part of the scheme. But the scheme was an Internet scheme. They didn't meet any of these – I mean, none of it was about schmoozing anybody on the lake. And so not only was it not charged, there's no evidence in the record whatsoever. Money laundering – were there separate money laundering counts for the boat and the vehicles and the e-trade account? Yes. There was – and the first one was the – about $38,000, I think, for the Ford Excursion. And the jury acquitted both defendants on that one. On which one, I'm sorry? On the first one, which was in early June of 2004. They used money to buy a Ford Excursion, which they said they were using to deliver. I see. So that – they were acquitted on that. Right. They were acquitted on that one. The boat – $50,000 for the boat, the Ford F-250 truck, and then the $40,000 that was put into the e-trade account to buy the Yahoo stock. Those were the three that Darren French was convicted of. And what did they say they needed the truck for? They – yeah, no, they said that the truck was to deliver appliances, which, you know, like I say, is also curious because on their eBay page, they say that everything's shipped by FedEx. So, you know, so – but regardless, the question is, if the money – I mean, it has to be integral to the scheme. Could we have charged – could the government have charged the purchase of the boat or the purchase of the F-450 as wire fraud, as mail fraud? It's not central to the scheme. It's not a necessary part of the scheme to defraud the way – and this kind of goes back to – I mean, in Van Alstyne, it was charged as a Ponzi scheme, right? And the essence of the Ponzi scheme is you pay the initial investors because that's what gives you the hype to get more money from people in the future. And so those payments to the initial investors, this Court said that's integral to the scheme. I mean, that is what a Ponzi scheme is. Now, the full refund that they gave to someone because he was starting to make noise, you know, that's not integral to the scheme. That's about covering up the scheme and avoiding detection, but that's not – that's not a necessary part of the scheme. And in this case, there is nothing about the scheme to defraud that required the French's to take some of the money that they got from their victims and buy a boat. It's just not there. Or to buy Yahoo stock. Well, those two seem right, but the truck seems a little flimsier. Well, the truck – I mean, I think that their argument about the truck relies on their claim that they were using that truck to deliver appliances to people. Well, somehow they have to deliver appliances to people. Well, not if they – not if this was just a scheme to defraud. I mean, there was after July – I don't know when the last date was that they provided. That goes back to the Ponzi scheme analogy. Yeah. Some people have to get their trucks delivered or the whole thing. Well, in this case, in this case, some people had to get – I mean, it was almost a reverse Ponzi. They had to get more money from people to give those first appliances. I suppose they got some positive feedback and maybe got some, you know, some pumped up from being able to supply those few – those first few. But they never had any other money but the money that they took from the customers who they said they could provide appliances to. I see I'm out of time unless the Court has other questions. You are. Judge Burson. Okay. Thank you very much, counsel. We appreciate the arguments of both parties. The case just argued is submitted. And our last case on this morning's docket is a consolidated case.
judges: Alarcon, Graber, Berzon